## SUGARMAN IRON & METAL CO. et al. v. SCHNITZER et al.

(Circuit Court of Appeals, Ninth Circuit.   June 30, 1924.)

No. 4220.

Joint adventures ⬤⟝1—Evidence held to sustain finding that there was no joint adventure.

Evidence *held* to sustain a finding that there was no joint adventure agreement between plaintiffs and defendants for purchase and resale at a profit of certain material.

Appeal from the District Court of the United States for the District of Oregon; Robert S. Bean, Judge.

Suit by the Sugarman Iron & Metal Company, a corporation, and Julius Gollober and others, copartners doing business under the name of the Rosenberg Iron & Metal Company, against Sam Schnitzer and another, copartners doing business under the firm name and style of the Alaska Junk Company. Decree for defendants, and complainants appeal. Affirmed.

This is an appeal from a decree of the District Court, made after trial, dismissing the complaint in an equity suit brought by plaintiffs appellants for an accounting. The complaint alleges that in 1922, at Portland, Or., Schnitzer and Wolf, defendants appellees, entered into an agreement of joint adventure with the plaintiffs, whereby plaintiffs agreed to furnish a sum of money to the defendants toward purchasing certain materials from the Standifer Construction Corporation, at Vancouver, Wash.; that defendants agreed to furnish $10,000 of the necessary capital and to use their best efforts in purchasing the materials for the best price obtainable for the use and benefit of the plaintiffs and defendants jointly; that the plaintiffs agreed to furnish all necessary capital over and above $10,000 for the purchase; that plaintiffs and defendants agreed that the material after purchase should be resold, defendants to receive jointly one-quarter of the profit, the plaintiff corporation one-quarter, Gollober one-quarter, and the Rosenbergs one-quarter, jointly; that plaintiffs lived in San Francisco, and relied upon the defendants, who lived in Portland, to carry out the agreement; that the defendants failed to perform, and bought the material for the exclusive benefit of themselves, concealing from plaintiffs the fact that they had bought the materials; that they resold at a large profit and refused to share with plaintiffs.

The answer denied specifically all allegations with relation to the alleged agreement of coadventure, and averred that defendants discussed with plaintiffs the question of the purchase of certain materials in the yard of the Standifer Construction Corporation, and that it was "suggested" that, if Sugarman and Sussman could raise all the funds over $10,000, which the defendants would provide, an attempt should be made to secure the property offered for sale, the same to be handled by defendants, profits to be divided one-third to Sugarman, one-third to Sussman, and one-third to defendants jointly; that, after a personal investigation, plaintiff Sugarman reported that the price was excessive, and left Portland; that defendants then personally negotiated with the construction company and notified Sussman that a certain portion of the material could be bought, and asked him to be ready with his share of the capital; that Sussman advised them that he could raise only $5,000, and to consider him out of the deal; that defendants waited several days, then telephoned to Sugarman at San Francisco, advising him that the purchase could be made, and requesting him to forward the money in order to close the transaction; that Sugarman replied that he was no longer interested in the matter and to consider him out of the deal; that, upon further requests by defendants that Sugarman reconsider his decision, Sugarman said he would

⬤⟝For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

send a representative that night or the following day to look over the situation; that no representative of Sugarman came to Portland, whereupon defendants, with others, made the purchase (excepting rails and buildings); and that, except for the original conversation with Sugarman, defendants never had any conversation or agreement with him concerning the purchase of the materials referred to.

Hugh Montgomery, of Portland, Or., and Louis H. Brownstone, of San Francisco, Cal., for appellants.

Malarkey, Seabrook & Dibble and Bernstein & Cohen, all of Portland, Or., for appellees.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge (after stating the facts as above). The assignments of error are based mainly upon the refusal of the court to find that there was a joint adventure between plaintiffs and defendants. From the voluminous record it is only necessary to summarize the more important evidence upon which we rest our conclusion.

Sugarman, of the Sugarman Iron & Metal Company, dealers in secondhand machinery in San Francisco, went to Portland in July, 1922, with one Horwitz, who was the confidential sales agent of the Standifer Construction Corporation, and one Sussman, a dealer in scrap iron, met Jones, a representative of the Standifer Company, and after checking over the material the Standifer Company offered for sale, Sugarman, Horwitz, and Sussman went to Horwitz's house, where they were joined by Schnitzer and Wolf, of the Alaska Junk Company. This suit is based upon what was said at that meeting.

Sugarman's version is that Schnitzer and Wolf wished to "go in" with him in figuring to buy the Standifer yard, and that Schnitzer told him he had $10,000 which he was willing to give him then, or whenever he bought the Standifer property; that he (Sugarman) declined this money on the ground that he had not bought yet; that thereupon they discussed interests in the transaction, if it should be consummated; that he told Schnitzer that Rosenberg and Gollober were interested, and that it was agreed that Schnitzer & Wolf, as copartners, should have one-quarter; that Schnitzer put his hand in his pocket and was ready to give him $5,000, but that he told Schnitzer it was not necessary to give him any money, as his word was good; that Schnitzer (meaning the firm of Schnitzer & Wolf) was in the deal for a quarter, and the others for three-quarters; that thereupon discussion was had as to the price to be paid, Schnitzer suggesting $75,000, Sussman and Sugarman estimating between $98,000 and $105,000 as the sum that would have to be paid; that at the time it was understood Schnitzer was to give $10,000 toward the purchase, and would help make the purchase and sell the material after it was bought; that they were to see the manager of the Standifer Company the next morning (Monday), and that, if the deal could not be closed, it was to be followed up and closed on the following Monday; that he next met Horwitz and Sussman at a hotel in Portland, and Horwitz, who was a "kind of go-between," was present at a talk had with the manager of the Standifer Company, who asked $125,000, but stated that the buildings and rails would be dropped out.

Sugarman also testified that he then offered $105,000, and reported to Schnitzer, who agreed to proceed; that Schnitzer was going to give a check, but that he (Sugarman) told him that there was no use giving him any money, as they had not bought the property yet. Sugarman then returned to San Francisco, and says that a few days later Schnitzer telephoned to him that Horwitz had a proposition from the Standifer people to sell for $115,000 for the plant; that thereupon Sugarman said that that was $10,000 more than they had estimated, and that Horwitz would want a commission out of that, but that he (Sugarman) would send a man to check up the figures and to investigate, to all of which Schnitzer agreed; that he told Schnitzer to keep him informed, and that upon notification he would "be there with the money"; that thereafter he heard nothing from Schnitzer until August 30th, when he learned that Schnitzer had bought the plant for $97,000; that he then telegraphed to Schnitzer, and on September 8th wrote to him to the effect that he was waiting for a reply to his telegram of August 30th, wherein he had stated that he understood Schnitzer and others had purchased the Standifer plant, and wanted to know if Schnitzer had figured on the purchase as agreed to in Portland. Sugarman's letter reminded Schnitzer of his agreement and appealed to him to stand by it. Sugarman received no reply, whereupon he went to Portland, saw Schnitzer and Wolf, and, upon questioning them as to why they violated the "agreement," Schnitzer replied, "You told me through the phone you didn't care for it any more," and that he had not sent a man. Sugarman then demanded his share, offered a check for $87,000, which was refused, and this litigation ensued. In some respects Horwitz and Sussman corroborated Sugarman.

On the other side, the version is radically different. Schnitzer testified that the only proposition made to him and Wolf by Sugarman, which they accepted, was that Sugarman was to get a price of $105,000 for the whole plant, including rails and buildings; that Schnitzer & Wolf and Sugarman and Sussman were to buy the material jointly at that price; Sugarman to have one-third, Sussman one-third, and Schnitzer & Wolf one-third. He says that at the interview at Horwitz's house nothing was said about Gollober and Rosenberg having any interest in the matter at all, and nothing was said about paying Horwitz a commission to get a reduction in price from $125,000 to $105,000; that at the hotel meeting in Portland, the day after Sugarman and Horwitz had seen the vice president of the Standifer Company, Sugarman and Horwitz reported that there would be no reduction in price; that nothing more was done until after Sugarman returned to San Francisco. Schnitzer positively denied that he was left in charge of negotiations with the Standifer Company, and says that upon a failure to get the price of $105,000 the whole transaction with Sugarman was at an end.

In describing the hotel interview in Portland, Schnitzer testified that Sugarman told him Jones' price was $165,000 for the whole yard; that he and Sugarman then said $125,000 was reasonable, if everything were included; that, during this interview with Sugarman, Horwitz telephoned that he had got the price down to $135,000 for everything

then in the yard, but that Sugarman refused to go back to see Jones and left for San Francisco, telling Schnitzer on the way to the train that he (Sugarman) had promised Horwitz a 5 per cent. commission, and that when he got to San Francisco he would let Schnitzer hear from him; that nothing was heard from Sugarman until August 7th; that Horwitz then told Schnitzer that the rails and buildings could not be purchased, but that the rest of the plant could be had for about $100,000, although between July 30th and the date of this talk the materials had been depleted by sales. At Horwitz's suggestion, Schnitzer says he telephoned Sugarman in San Francisco that Horwitz said the rails and buildings were not to be sold, but the balance could be had for about $100,000; that Schnitzer wanted to see where the money was coming from; that Sugarman told him he was "out of it"; that he tried to persuade Sugarman to stay in, that it was a good proposition, saying that he (Schnitzer) would deposit $5,000 to "tie up" the matter; that Sugarman said, "On my say-so, don't give a nickel;" that after further talk Sugarman said he would send a man that night or next day to Portland with authority to represent him; that the man never came; that he reported the interview to Horwitz, who was present, telling him that Sugarman said he was out of it.

Further evidence is that, after waiting 10 days or more for Sugarman's man, defendants made unsuccessful attempts to interest certain named persons in Portland in the proposition, and later succeeded in inducing one Glickman to advance a sum of money for the property without the buildings and rails and some other materials that had been sold. Their contract with Glickman was in writing, dated August 24, 1922. Wolf's testimony corroborated Schnitzer.

We gather that there was an understanding arrived at during the meeting at Horwitz's house, but the evidence of its character does not support a conclusion that it was more than tentative, contingent upon negotiations to be carried on by Sugarman with expedition. Expedition was essential, for all understood that sales were daily lessening the materials offered for sale by the company, and that the value of the plant was subject to daily material change. Two very important circumstances in Sugarman's evidence are that, at the time of the understanding, Sugarman refused to accept the proffer of money which he says was made by Schnitzer, and that afterwards he failed to send a representative from San Francisco to Portland to investigate. Explanations by Sugarman of these matters were not satisfactory to the District Court, and do not appeal to us as at all sufficient. If the parties had reached a definite agreement by way of joint adventure at Horwitz's house, the natural thing for Sugarman, as a business man, to have done, would be either to make a written memorandum, or to accept the money of his co-adventurers; and if Sugarman had really expected to participate he would have fulfilled his promise by sending a man to Portland. Schnitzer's statement that Sugarman said over the telephone that he was "out of it" finds strong corroboration in the fact that no representative came from San Francisco, and that nothing was heard from Sugarman until he learned of the purchase by Schnitzer. It is therefore reasonably certain that Sugarman voluntarily and

intentionally abandoned any existing relationship with the appellees.

We do not construe the defendants' answer as an admission of the making or existence of the alleged agreement. A fair construction of the defendants' pleading is that a suggestion was made to the effect that, if the funds were forthcoming, an effort should be made to buy, and that the property, if acquired, should be placed for sale and trading purposes in the hands of the defendants.

The decree is affirmed.